**James BLADES III, Petitioner,**

v.

**David MILLER, Superintendent, Respondent.**

No. 00–CV–923.

United States District Court, S.D. New York.

Sept. 28, 2001.

James Blades III, Napanoch, NY, Pro se.

### *ORDER*

MARRERO, District Judge.

Petitioner James Blades III ("Blades") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Magistrate Judge Douglas F. Eaton issued a Report and. Recommendation, dated August 31, 2001 (the "Report"), recommending that the petition be denied in all respects. The Report is incorporated and attached hereto as Exhibit A. Blades has interposed no objection to the Report.

The Court has considered each of the nine issues raised in Blades's petition and Magistrate Judge Eaton's analysis and conclusions with respect to each of them. The Court finds no meritorious basis in law to support Blades's challenge to his conviction on any of the grounds he asserts. In examining the record and the law pertinent to this petition, the Court concludes that there is a sufficient basis in fact for the verdict and sentence reflected in the judgment entered against Blades and that the principles and authorities relied upon by Magistrate Judge Eaton in recommending denial of the petition are controlling and sufficient to dispose of each of Blades's arguments. Therefore, the Court accepts and adopts the Report in its entirety.

Accordingly, it is hereby

**ORDERED** that the writ is denied; and it is further

**ORDERED** that the petition is dismissed with prejudice.

As Blades has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). *See also United States v. Perez,* 129 F.3d 255, 259–60 (2d Cir.1997); *Lozada v. United States,* 107 F.3d 1011, 1014–16 (2d Cir. 1997). The Court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), any appeal from this Order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**SO ORDERED.**

### *REPORT AND RECOMMENDATION TO JUDGE MARRERO*

EATON, United States Magistrate Judge.

James Blades brings this *pro se* habeas petition challenging his 1995 conviction in Supreme Court, New York County before Justice Frederic Berman and a jury. The evidence showed that Blades and Allen

Marshall barged into the apartment of a man who was withholding rent from his landlord, and threatened to kill him if he did not vacate the apartment within a week. Marshall pleaded guilty prior to trial. The jury found Blades guilty of first and second-degree burglary, first-degree attempted coercion, and two counts of third-degree weapons possession. For the first-degree burglary, Blades was sentenced as a persistent violent felony offender to 13 years to life; he received lesser concurrent sentences on the other counts.

Blades's *pro se* petition alleges nine grounds; its annexed Memorandum of Law contains 94 pages plus exhibits. On September 29, 2000, Assistant Attorney General David Camuzo served an opposing Memorandum of Law and an Affidavit annexing Exhibits A through M. I will refer to certain of these Exhibits as "Exh. __." Blades replied with a 27–page traverse postmarked November 21, 2000. For the reasons stated below, I recommend that Judge Marrero deny the petition.

*PROCEDURAL BACKGROUND*

Blades's trial attorney was Elliot Leibowitz. On appeal, Blades was represented by Lisa Freeland of the Office of the Appellate Defender.

Ms. Freeland's briefs to the Appellate Division (Exhs. B and D) raised only two points: (1) that the reception of Marshall's guilty plea allocution (slightly redacted) violated Blades's right to confront one of the witnesses against him; and (2) that the trial court abused its State-law discretion in its *Sandoval* ruling. In a *pro se* supplemental brief (Exh. E) Blades raised ten additional points. The Appellate Division rejected all of the points. (Exh. F.)

On June 23, 1998, Judge Howard A. Levine granted leave to appeal to the New York Court of Appeals. (Exh. H.) This was after leave letters had been submitted by Ms. Freeland and by Blades *pro se.* (Exh. G.)

Next, there was full briefing to the Court of Appeals. (Exhs. I through K.) The Exhibits before me do not include the *pro se* brief from that stage, but the last two pages of Exhibit G show that Blades submitted a *pro se* brief dated September 4, 1998 and that the Clerk's Office wrote that it "will be submitted to the Court for whatever consideration the Court deems appropriate." Moreover, the prosecutor's brief then responded to all ten of the *pro se* points. (See Exh. J at pp. 63–82.) Accordingly, it is clear that Blades presented the highest court of New York with all of the claims that are now in his habeas petition.

The Court of Appeals affirmed the conviction. Its unanimous opinion (Exh. L) discussed only the first point. Unlike the Appellate Division, it concluded that the trial judge erred in permitting Blades's jury to hear Marshall's plea allocution. Nevertheless, the Court of Appeals unanimously found that the error was harmless.

The Court of Appeals noted that Marshall's allocution, as read to the jury at Tr. 965–69, was redacted so that references to Blades were changed to references to a "second person." But the Court of Appeals also noted that, immediately before this, the prosecutor read a stipulation (at Tr. 962–63) which specifically informed the jury that Marshall was indicted with Blades. The Court of Appeals concluded as follows:

> ... Marshall's allocution statements ... are not demonstrably reliable, and the deprivation of Blades' ability to confront Marshall at trial, thus, constitutes error.

> \* \* \* \* \* \*

There is *overwhelming* evidence of guilt, however, in this case, including the

almost comical, virtually caught red-handed act of discarding evidence at every step and turn away from the crime scene. Moreover, as noted previously, the trial court in its jury instructions expressly limited the use of the allocution to the issue of whether Blades acted in concert with another. As this was not an element to be established for his conviction of burglary in the first degree, the introduction of the Marshall allocution for that limited purpose cannot be said, in the circumstances and context of this case, to have had a possible prejudicial impact on the jury's verdict on that crime. [On the other counts, Blades received Lesser concurrent sentences.] We are, therefore, satisfied that the case is an appropriate candidate for the application of the *deus ex machina*— harmless error . . . .

*People v. Blades*, 93 N.Y.2d 166, 177, 689 N.Y.S.2d 1, 7–8, 711 N.E.2d 187 (1999).

### *LEGAL ANALYSIS*

I shall now discuss each of the nine grounds in Blades's habeas petition. He stated them somewhat differently in his annexed Memorandum of Law, especially the first two grounds. My headings will generally quote from the argument headings in the Memorandum of Law.

*Ground I: "Petitioner argues that the introduction of the redacted plea allocution of [the] non-testifying co-defendant violated his [S]ixth [A]mendment . . . right to confrontation."*

Marshall pleaded guilty but, when he was produced before Justice Berman, he said he would refuse to testify at Blades's trial. (Tr. 188–89.) After extensive oral argument, Justice Berman decided to allow Blades's jury to hear Marshall's redacted plea allocution. (Tr. 176–216, 704–60, 792–94.) As noted above, the highest court of New York later ruled that this evidentiary ruling violated Blades's Sixth Amendment right to confront Marshall.

But it is not clear that the federal courts would reach the same conclusion. See *Williamson v. United States*, 512 U.S. 594, 605, 114 S.Ct. 2431, 2437, 129 L.Ed.2d 476 (1994); *United States v. Moskowitz*, 215 F.3d 265, 268–70 (2d Cir.2000).

In any event, AAG Camuzo's 9/29/00 brief chose to rest on the harmlessness of the allocution, and not to dispute that there was a violation of Blades's right to confrontation. In Ground I, Blades occasionally refers to the issue of harmless error, but he deals with that issue more fully under Ground II, so I will discuss it there. As far as I can tell, his main point in Ground I is to describe how serious the violation was. See Pet. Mem. at 1–13, and Traverse at 1–7. However, he does make the following concession at page 3 of his Traverse:

> . . . Had that portion of the redacted plea allocution dealing exclusively with Marshall's [own] actions and intentions been solely introduced[,] it would not have constituted a *Bruton* violation.

That unchallenged portion included Marshall's admission that he put an air pistol against the temple of the victim and that "I told him that I had a message for him . . . . that he would have to leave the apartment within a week." (Tr. 967–68.)

*Ground II: Petitioner argues that "The New York Court of Appeals decision . . . that the . . . plea allocution was harmless error . . . is inappropriate . . . ."*

In the passage of its decision quoted earlier, the Court of Appeals based its harmless-error ruling on three reasons: (1) "overwhelming evidence of guilt," (2) jury instructions [Tr. 964, 969–70, 1077] which "expressly limited the use of the allocution to the issue of whether Blades acted in concert with another," and (3) as a matter of State law, acting in concert was not an essential element for the top count,

burglary in the first degree. The third reason, in my view, is undercut by the fact that the judge told the jury that acting in concert was an essential element. (Tr. 1086–91.)

■ A State court's harmless-error conclusion is a mixed question of law and fact. *Gill v. Pastena*, 1997 WL 615000, at *3 (S.D.N.Y. Oct. 6, 1997)(Muskasey, J.); *Lowery v. Collins*, 988 F.2d 1364, 1371–72 (5th Cir.1993). Thus, it is not a "determination of a factual issue" within the meaning of 28 U.S.C. § 2254(e)(1) and it is not entitled to that subsection's presumption of correctness. Accordingly, our Court must make a *de novo* determination concerning the issue of harmless error.

■ Since this is a habeas proceeding, the standard by which our Court must evaluate the issue of harmless error is not the rigorous standard of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); instead, the standard in habeas is the one mandated by *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)... "whether, in light of the record as a whole, the (trial error) 'had substantial and injurious effect or influence in determining the jury's verdict.' "

In Ground II, Blades argues that the evidence was not really overwhelming. As soon as the two perpetrators left the scene of the crime an apartment on 127th Street, the victim went to the street and saw the two men turning the corner toward 126th Street. He followed them, and he and two police officers quickly observed both men on 126th Street, where they were arrested. Blades spends much time arguing that the prosecution's case would have been weaker if the trial judge had not allowed the victim to testify that he positively identified both perpetrators at the time of their arrest and later in the station house. (Tr. 660–61, 681, 690.) Two officers then testified that Blades was one of the two men

they arrested that day. (Tr. 770, 880.) This made clear to the jury that Blades was one of the two men identified by the victim, even though the victim was much less certain when he confronted Blades at the trial eight months later. Blades argues, as he did in his *pro se* briefs in State court, that the prosecutor failed to lay the foundation required by New York Criminal Procedure Law § 60.25 for the reception of such "out-of-court identification evidence." (See Exh. E at pp. 9–35.) The prosecutor's briefs in State court (esp. Exh. J at pp. 27–30) explained in detail why Blades was wrong on this issue, and the State courts rejected Blades's State-law claim.

Blades now attempts to dress up this claim as a Federal constitutional claim. At page 7, his Traverse says:

In traversing the People's answer at Point II that the identification evidence presented by the People constituted overwhelming evidence of guilt.... petitioner argues that alleged overwhelming evidence of guilt was in fact factually insufficient and contrary to New York Criminal Procedure statute and thus was contra[r]y to Supreme Court holdings at *Hicks v. Oklahoma*, 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980); *Moore v. Irvin*, 908 F.Supp. 200, 208 (N.D.N.Y.1995) which prohibit arbitrary enforcement of state criminal procedure ....

*Hicks* and *Moore* are utterly off point. In *Hicks*, the jury imposed the sentence and Oklahoma conceded that the jury had been instructed about a sentencing statute which was later held unconstitutional, yet Oklahoma resisted having a new jury resentence Hicks. In *Moore*, Judge Koeltl held that consecutive sentences were not unconstitutional.

■ In short, Blades has failed to show that his constitutional rights were violated

when the jury was permitted to hear that the victim identified Marshall and Blades on 126th Street and again at the station house. I shall now proceed to discuss the record as whole, and to assess Blades's claim that the challenged portions of Marshall's allocution "had substantial and injurious effect or influence in determining the jury's verdict."

In July 1994, Rudolph Headley and his common-law wife Doris Hill lived in an apartment at 21 West 127th Street in Manhattan. (Tr. 522–23.) For some time Headley had withheld his rent because of a dispute over the condition of his apartment. (Tr. 526–27.)

On July 25, 1994, shortly before 9:00 a.m., two men knocked on the apartment door. The two men told Headley and his wife that they were with the "HPD". (Headley: Tr. 525, 538–539; Hill: Tr. 600–01.) Headley understood "HPD" to be the "Housing Preservation Development," an agency which inspects apartments for violations. Accordingly, Headley opened the door. (Tr. 539–540.)

■ Headley testified that he saw two Afro–American men at his door. (Tr. 540, 559, 662, 683–84.) It is undisputed that the first man was Marshall— heavy-set, with a mustache and wearing a yellow hard hat. (Tr. 540, 548–49.) The jury found that the second man was Blades. Headley testified that there was bright flourescent lighting in the outer hallway plus a lamp shining out from the interior hall (Tr. 559), and that he observed the second man to be tall, slim, bald, and "big-bearded," wearing a plaid shirt and carrying a briefcase. (Tr. 540, 542, 549.) Headley asked the men for identification, and Marshall pulled out an air pistol. The two men barged into the apartment and forced Headley into a bathroom. (Tr. 540–41.) Ms. Hill, standing at the bedroom door, was able to see Marshall but was unable to see the second man, who blocked her view by closing an interior door. (Tr. 605–06, 628–29.) Marshall made Headley kneel, and then he "banged" the pistol against Headley's head. (Tr. 541.) The second man opened his briefcase, pulled out a roll of gray duct tape, and bound Headley's wrists. (Tr. 541, 554.) The second man also brought a length of pipe wrapped in black tape, and he repeatedly slapped it against the palm of his own hand. (Tr. 543–44, 549–50, 694.) Marshall threatened to kill Headley if he did not vacate the apartment within a week. (Tr. 543, 545, 561.) The entire confrontation lasted three to five minutes. (Tr. 558, 694.)

As soon as the two men had left, Headley freed himself from the duct tape, told his wife what had happened, and ran downstairs to give chase. (Tr. 545–46, 562, 606–07.) Ms. Hill went to an adjoining apartment overlooking West 127th Street, and she spotted Marshall on the street, walking with a tall black man in a plaid shirt who was either bald or had closely-cropped hair. (Tr. 608, 612–16, 630–31.)

After Headley ran out of his building, he saw the two men Cross West 127th Street, but then briefly lost sight of them when they turned the corner and headed south on Fifth Avenue. (Tr. 646, 664–65, 646.) As Hill watched, Headley pursued the men to the corner; there, Headley saw a police car. (Tr. 546–47, 615, 652.)

Police Officers Timothy Pollick and John Saita were in the car, and they responded to Headley's shouts. (Tr. 765–66, 774, 776, 806, 822–23.) Headley saw the two perpetrator turn away from Fifth Avenue and walk west on West 126th Street. (Tr. 547, 566.) Headley ran to that same corner and pointed down 126th Street, and the officers followed. From the corner, Headley and the two officers saw the two men walking about one-third of the way up the block. (Tr. 547, 567, 650, 767, 776–77, 806–

07, 827–30, 860, 876–77, 883–84, 903–05.) Marshall was still wearing his yellow hard hat; the second man (soon identified as Blades) was still wearing a plaid shirt and still carrying a briefcase. (Tr. 570, 649, 659.), Headley "pointed, there they are." (Headley: Tr. 547; see also Pollick; Tr. 767–68, 871; Saita: Tr. 877.)

The two officers testified that they saw Blades reach across his chest and then flip a "black cylindrical" object to his right. (Pollick: Tr. 768, 780–81, 807, 820–21, 849–50; Saita: Tr. 877, 885, 897.) Before Marshall and Blades got half way down the block, they were arrested. (Tr. 782.) At that time, Headley recognized their faces as those of the two men who had threatened him so recently in his apartment. (Tr. 567–68, 658–89.) Pollick looked inside Blades's briefcase and seized a roll of gray duct tape. (Tr. 770, 788.) After additional police arrived, Pollick and Saita walked about 30 feet to the area where they had seen Blades flipping the black cylindrical object. They found a 15–inch metal pipe covered with black electrical tape. A short distance further, they found Marshall's air pistol. (Tr. 782–89, 878, 888–92.) Headley saw the metal pipe and the air pistol on the street after the police found them, and he recognized them to be the weapons carried by the two perpetrators in his apartment. (Tr. 572–73, 676–79.) The tape which the second man had used to bind Headley's wrists was still in the apartment where Headley had ripped it off; Pollick soon went there and took the torn tape as evidence, and it matched the roll of tape in Blades's briefcase. (Tr. 673–75, 680, 809–10, 817.)

The officers then drove Headley and his wife to the station house. About 15 minutes after the arrest, Headley saw Marshall and Blades standing at the sergeant's desk. (Tr. 679–84, 783, 810–11, 893–94.) Headley again recognized them as the two men who had been in his apartment. (Tr. 681,

688–92.) His wife testified that at this point he told her, "there are the guys." (Tr. 618.)

Eight months later, at the trial, Headley testified that Blades "could be the man," but he could not "positively say." (Tr. 686–87.) On the other hand, he told the jury that he viewed the two arrestees on 126th Street, and again at the station house, that he positively recognized both arrestees as the perpetrators, and that he remained sure of the correctness of those recognitions. (Tr. 660–61, 681, 690.) Unrebutted evidence from the two arresting officers showed that the two arrestees were Marshall and Blades. (Tr. 679–70, 879–80.) In addition, Pollick testified that Blades looked "markedly different" at trial than on the day he was arrested, and that his beard had changed from "very dark" to almost "entirely gray." (Tr. 809.)

Moreover, strong circumstantial evidence identified Blades as the second perpetrator, who bound Headley's wrists with gray duct tape and who menaced him with the metal pipe wrapped in black tape. As mentioned above, the torn gray duct tape was recovered from the apartment, and it matched the roll of gray duct tape seized from the briefcase Blades was carrying when arrested. The metal pipe wrapped in black tape was discovered in the area where the officers had seen Blades flipping an object.

The defense presented no witnesses.

Having made a *de novo* review of the record, I find that the evidence properly received against Blades was indeed overwhelming, and that the challenged portions of marshall's allocution did not have "substantial and injurious effect or influence in determining the jury's verdict." Accordingly, Ground Two has no merit.

*Ground III: Petitioner argues that "The Hearing Court's failure to suppress the ... claimed identification of petitioner and [the] illegally seized items constituted" violations of the Fourth and Fourteenth Amendments.*

Blades argues that the police lacked probable cause to arrest him and to search the briefcase he was carrying. Blades had a full and fair opportunity to litigate this claim at the pretrial suppression hearing, which was held by Justice Richard Carruthers. The transcript of that hearing has not been submitted to me, but the hearing testimony and Justice Carruthers's decision were summarized in detail in the appellate briefs of the State (Exh. C at pp. 4–8, 57–59) and of Blades *pro se* (Exh. E at pp. 38–43.)

AAG Camuzo's brief at page 23 cited the controlling precedents of *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Gates v. Henderson*, 568 F.2d 830 (2d Cir.1977), and *McPhail v. Warden*, 707 F.2d 67 (2d Cir.1983). Blades's traverse (see p. 14) has no answer to these precedents. Accordingly, our Court cannot entertain a habeas petitioner's arguments that the hearing judge drew the wrong conclusions from the testimony.

*Ground IV: Petitioner argues that "The trial court deprived petitioner of his constitutional right to testify by reason of its determination that the People would be allowed to introduce all aspects of petitioner's prior criminal record [if he testified]."*

The Appellate Division found that Justice Berman's *Sandoval* ruling "carefully balanced the relevant factors and was a proper exercise of discretion in view of the probative value of defendant's theft-related convictions." (Exh. F.)

■ Now that Blades has come to federal court, Ground IV is barred by the fact that he did not testify. "It is well-settled that a petitioner's failure to testify at trial is fatal to any claims of constitutional deprivation arising out of a *Sandoval*-type ruling." *McEachin v. Ross*, 951 F.Supp. 478, 481 (S.D.N.Y.1997) (Chin, J.), citing *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).

*Ground V: Petitioner argues that "The trial court's determination that petitioner's photographic exhibit ... was not relevant deprived ... his constitutional right to submit evidence and cross-examine the People's witnesses."*

During jury selection, Justice Berman signed an order granting the defense money to have an investigator take photographs of 126th Street. (Tr. 58–60.) At Tr. 827–34, defense attorney Liebowitz was cross-examining Officer Pollick about what he was able to see when he looked down 126th Street. At Tr. 834, the defense offered three photographs which apparently portrayed the full extent of 126th Street from Fifth Avenue to Lenox Avenue. The jury was excused and a colloquy ensued.

■ The prosecutor mentioned that she had a similar photograph which she intended to introduce later in the trial. (Tr. 839–40.) Justice Berman looked at it and said, "that's a better picture than the one [defense] counsel wants to introduce." (Tr. 840.) Later, he explained why he felt that the three defense photographs had no evidentiary value. (Tr. 842.) When the jury returned, the defense attorney placed the prosecution's photograph into evidence as a defense exhibit. (Tr. 843–44.) From Tr. 844 to 854, he resumed his cross-examination about the distance between Blades and the officer when the latter allegedly saw Blades throw away the metal pipe. The defense gave no indication that its cross-examination was hindered by the fact that it used only one photograph,

without the other three. Accordingly, Ground V is unpreserved and meritless.

*Ground VI: Petitioner argues that the prosecutor's peremptory challenges to three black men deprived him "of his constitutional right to be tried by a jury unaffected by racial or gender considerations."*

I have the transcript of the jury selection. (Tr. 63–171, 216–475.) Moreover, it was summarized in detail in the State's brief to the New York Court of Appeals. (Exh. J at pp. 67–74.) In evaluating claims that the prosecution has exercised its peremptory challenges in a racially discriminatory manner, a three-step analysis must be used. *Batson v. Kentucky,* 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986). First. The defendant must make a prima facie showing that the prosecutor excluded jurors on the basis of race. Second. The prosecution then bears the burden of providing a race-neutral explanation for its peremptory challenges. Third. If the prosecution satisfies its burden, the trial court must then determine whether the defendant has established purposeful discrimination. "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). At Tr. 243–51, Justice Berman followed the three-step procedure and, after hearing both attorneys, made his determinations. Including the following: "All right, I'm satisfied that on the basis of the People's response, that there was a non-racial, non-pretextu[ ]al basis for exercising peremptory challenge." (Tr. 247.)

■■■ 28 U.S.C. § 2254(e)(1) requires that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Blades has not come close to rebutting this presumption as to any of the three prospective jurors he says he wanted— Mr. Capanon (born in the Philippines, Tr. 107), Mr. Mussington and Mr. Isgess, all three described by defense counsel as persons of color (Tr. 245). As to Capanon, the prosecutor said that she "found his body language to be hostile to the prosecution," that he crossed his arms when she spoke but not when defense counsel spoke. (Tr. 245–246.) "An impression of the conduct and demeanor of a prospective juror during the *voir dire* may provide a legitimate basis for the exercise of a peremptory challenge." *Brown v. Kelly,* 973 F.2d 116, 121 (2nd Cir.1992). Indeed, defense counsel cited "body language" at Tr. 249–50 in explaining why he had challenged a white juror. In the same vein, the prosecutor went on to say: "Mr. Mussington I struck in response to his response to the defense questions . . . . It seemed to me that he was being rather rigid and rather automatic . . . ." (Tr. 246.) Finally, the prosecutor noted that she had informed the jurors that the victim had a criminal record, and that Isgess told her, "You mean you expect me to listen to the testimony of a crook." (Tr. 246.) Her recollection was essentially accurate; on the previous day, Isgess said, "common sense would tell you, if I can phrase it this way, to watch a crook's testimony. . . . common sense would tell you this guy is not true credible." (Tr. 156.)

Justice Berman saw and heard these prospective jurors, and observed the prosecutor as she was giving her reasons, and found that she was credible.

*Ground VII: Petitioner argues that he was denied effective assistance of counsel.*

■■ Ground VII is a half-hearted claim. Blades makes conclusory allegations that Mr. Liebowitz was unprepared

on the law and the facts. Essentially, Blades offers only one ground for this assertion—— the fact that he lost the case. Petitioner's memorandum of law, at page 72, says:

> At the ... pre trial hearing ... Mr. Liebowitz conducted a thorough fact finding cross-examination .... However, at the conclusion of the testimony Mr. Liebowitz after marshalling all the relevant facts failed to apply the appropriate law governing those issues.

Similarly, at page 75, he says:

> A review of the entire trial record reveals that although Mr. Liebowitz argued with zeal his arguments were never based upon statu[t]e or precedent.

Based on my review of the record, Ground VII has no merit.

*Ground VIII: Petitioner argues that he "was denied due process and equal protection of the law when [the] sentencing court denied petitioner [a full-blown] hearing on defense claims of prior constitutional infirmities of [his 1972 and 1986 convictions]."*

On the top count (first-degree burglary) Justice Berman sentenced Blades as a persistent violent felony offender to a term of 13 years to life. I do not have the sentencing transcript, but the sentencing is described in detail in the State's brief to the Court of Appeals. (Exh. J at pp. 76–81.)

It is undisputed that in 1972, after a jury trial, Blades was convicted of first-degree robbery and second-degree burglary and was sentenced to a term of zero to 20 years, and that the Appellate Division affirmed by a vote of 4 to 1 and the Court of Appeals affirmed without opinion by a vote of 7 to 0. *People v. Blades,* 44 A.D.2d 537, 353 N.Y.S.2d 442 (1st Dept.1974), *aff'd,* 36 N.Y.2d 668, 365 N.Y.S.2d 851, 325 N.E.2d 167 (Ct.App.1975). Petitioner's Memorandum, at page 80, acknowledges that the Appellate Division, utilizing its special power, reviewed the weight of the 1972 evidence; his only complaint appears to be an allegation that the Appellate Division failed "to undertake a legal sufficiency analysis as well." On the contrary, the Appellate Division wrote that "[t]he proof was so substantial that the appellant does not challenge it on this appeal and neither does the dissent." 353 N.Y.S.2d at 442.

It is also undisputed that in 1986, as part of a plea bargain (Pet. Mem. at p. 81), Blades was convicted of attempted second-degree burglary. His only complaint seems to concern the sentence; he alleges that "the ruling of the 1986 sentencing court on estoppel effectively relieved the People of their burden ... to establish the constitutionality of [the 1972 conviction]." (Pet. Mem. at p. 86.) He apparently presented this argument to the Appellate Division, which affirmed the 1986 judgment without opinion. *People v. Blades,* 147 A.D.2d 989, 538 N.Y.S.2d 886 (1st Dept. 1989), *leave denied,* 73 N.Y.2d 1011, 541 N.Y.S.2d 766, 539 N.E.2d 594 (1989).

Blades has failed to articulate anything to suggest the unconstitutionality of the 1972 or the 1986 convictions, nor the unconstitutionality of Justice Berman's finding of the validity of those two convictions (on which Blades had exhausted all direct appeals). However, Blades is confident that he might come up with something if our Court would "order copies of the 1972 and 1986, trial and sentencing transcripts in addition to the 1995 trial transcripts." (Pet. Mem. at p. 87.) I decline to issue such an order.

*Ground IX: "Petitioner argues that the superseding of indictment No. 7062—94 by indictment No. 8931—94 deprived him of the 14th amendment right of due process and equal protection of the law."*

The original indictment charged second-degree burglary as the top count. Later, the prosecutor concluded that the evidence

showed first-degree burglary, because Blades had threatened the immediate use of a dangerous instrument, namely the metal pipe. Six months before the trial, the prosecutor presented the same evidence to a second grand jury and obtained a superseding indictment which added a count of first-degree burglary. Justice Berman instructed the jury on both first-degree and second-degree burglary. (Tr. 1086–95.)

Blades argues that "an indictment may not be amended or superseded," and cites *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). (Pet. Mem. at pp. 90–91.) AAG Camuzo's brief, at page 40, correctly notes that Blades appears to have confused the difference between an amendment (which bypasses the grand jury) and a superseder which obtains the vote of a second grand jury. Ground IX clearly has no merit.

### CONCLUSION

For the reasons stated above, I recommend that Judge Marrero deny the petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy, by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. Victor Marrero, U.S.D.J. at Room 414, 40 Centre Street, New York, N.Y. 10007 and (c) to me at Room 1360, 500 Pearl Street. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988). Any request for an extension of time must be addressed to the District Judge.

Aug. 31, 2001.